*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HOUSING OPPORTUNITIES MADE EQUAL INC., <br>         Plaintiff, <br><br>         vs. <br><br> AVANT REALTY LLC, AND CHARLES GLANDER, <br>         Defendants. | Civil Action No. 1:25-cv-40 <br><br> **COMPLAINT** |

### INTRODUCTION

1.     All New Yorkers have the right to receive full and accurate information about available housing options when searching for a home. Race should never determine if they get it. Racial steering—the practice of limiting information or guiding prospective home seekers to certain neighborhoods on the basis of race—prevents individuals from accessing the information they are entitled to, impacts what communities they live in, and perpetuates residential segregation. The Fair Housing Act unequivocally prohibits this form of discrimination.

2.     Despite this, Defendants Avant Realty LLC and Charles Glander, the founder of Avant and a licensed real estate broker there, have repeatedly engaged in unlawful racial steering practices.

3.     Plaintiff Housing Opportunities Made Equal Inc. ("HOME") is a nonprofit fair housing organization in Buffalo, New York that provides services to prospective home seekers to ensure that they can find housing without regard to their race or other protected characteristics. To achieve that mission and ensure compliance with the Fair Housing Act ("FHA"), HOME investigates real estate professionals. Their investigation of Defendants revealed that Defendants

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

treated prospective home seekers in the Buffalo-Niagara Falls metropolitan area differently based on race on multiple occasions.

4.     Specifically, Defendants: (1) uniformly discouraged white testers from seeking housing in majority-Black neighborhoods in the East Side of Buffalo, but did not uniformly discourage Black testers from seeking housing in the same neighborhoods on the East Side, and at times, affirmatively recommended they seek housing there; (2) made disparaging, racially charged comments about majority-Black neighborhoods on the East Side of Buffalo, including that certain neighborhoods were places where you would hear gunshots or be living next to a "crack house;" and (3) emphasized different neighborhood characteristics to Black testers as compared to white testers.

5.     Defendants' practices violated both the FHA and the New York State Human Rights Law.

6.     Defendants' unlawful practices also contributed to residential segregation in the Buffalo-Niagara Falls metropolitan area, a problem that remains entrenched in the region. As of the 2020 Census, Buffalo was one of the most segregated cities in the United States.

7.     Defendants' unlawful actions have injured Plaintiff and impaired its ability to provide housing to all regardless of race. Because of Defendants' conduct, Plaintiff has had to divert its limited staff resources from its core activities, including housing counseling and referral services, to investigate Defendants and then to engage in activities to address Defendants' behavior.

8.     Plaintiff brings this action to vindicate its rights under the FHA and New York State Human Rights Law, seeking an injunction of Defendants' racially discriminatory real estate practices.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

## JURISDICTION AND VENUE

9.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343, because the matters in this controversy arise under the laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988. This Court has supplemental jurisdiction over the New York State Human Rights Law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all the events giving rise to the claims occurred in this district and because Defendants maintain offices and conduct business in this district. Plaintiff Housing Opportunities Made Equal of Buffalo, Inc. operates within this district.

## PARTIES

11.     Plaintiff ("HOME") was founded in 1963 and is a nonprofit fair housing organization with its principal place of business at 1542 Main Street, Buffalo, New York, 14209. It provides fair housing enforcement and education as well as housing and mobility counseling to increase access to housing opportunities in the area. HOME's mobility program assists low-income residents with securing available housing in Western New York, including in the Buffalo-Niagara Falls metropolitan area.

12.     HOME's mission is to promote the value of diversity and ensure all people have an equal opportunity to live in housing and communities of their choice. HOME pursues its mission through core business activities related to fair and equal access to housing, including its housing mobility programs, housing counseling and referral services, public outreach and trainings, fair housing investigations into reported incidents of discrimination, client advocacy, and support services for victims of discrimination.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

13.     HOME also provides contractual fair housing services for New York state and local governments, including public outreach and public education services.

14.     Defendant Avant Realty LLC ("Avant") is a real estate company that represents sellers and buyers in real estate transactions. It is incorporated under the laws of the State of New York, and its principal place of business is 2778 Main Street, Newfane, NY 14108. Avant engages in real estate business in this district.

15.     Defendant Charles Glander ("Glander") is a white male. He is a licensed real estate broker and the founder of Avant. He is currently employed by Avant and appears on its website. He is registered with the New York State Division of Corporations to accept service on behalf of Avant. He engages in real estate business in this district. Glander is, and upon information and belief has been at some or all relevant times, the principal of Avant, such that Avant is liable for his acts alleged herein. In acting or failing to act as alleged herein, Glander was acting in the course and scope of his actual or apparent authority pursuant to his position as principal of Avant. Glander's alleged acts or omissions were subsequently ratified and adopted by Avant.

## FACTUAL ALLEGATIONS

### A.  Residential Segregation in Buffalo.

16.     Buffalo, New York is the seventh most segregated metropolitan area in the United States when measured by Black-white neighborhood segregation in the 2020 census.[1]  The majority of the city's Black residents live on the East side of Main Street, while white residents are overrepresented on the West Side of Main Street and surrounding Erie County suburbs.

---

[1] William Frey, *A 2020 Census Portrait of America's Largest Metro Areas: Population growth, diversity, segregation, and youth*, The Brookings Institution, 27 (April 21, 2022), https://digitalscholarship.unlv.edu/brookings_policybriefs_reports/11.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*



Source: U-Va. Cooper Center analysis of 2010 Census data, The Washington Post.

17.     Buffalo is the second most populous city in New York State, with a population of 274,686.[2] From 1950 to 2000, Buffalo's Black population went from 3% to 38%, while the white population declined from 96% to 50%, with many white residents moving out of the city limits and into the suburbs.[3]

18.     Persistent housing discrimination and other barriers to housing have shaped the demographics of Buffalo's neighborhoods. For example, in 2015, the New York State Office of the Attorney General entered into a settlement with Buffalo-based Evans Bank, following litigation

---

[2] Buffalo, NY - Profile data, American Community Survey 2023 1-year estimates, Census Reporter, https://censusreporter.org/profiles/16000US3611000-buffalo-ny/ (last visited Jan. 10, 2025).

[3] *See* Mapping Inequality: Redlining in New Deal America, Digital Scholarship Lab (2023), https://dsl.richmond.edu/panorama/redlining/map/NY/Buffalo/ (choose "Context") (last visited Jan. 10, 2025); Anna Blatto, *A City Divided: A Brief History of Segregation in Buffalo*, P'ship for the Pub. Good, 11–12 (Apr. 2018), https://ppgbuffalo.org/files/documents/data-demographics-history/a_city_divided__a_brief_history_of_segregation_in_the_city_of_buffalo.pdf.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

challenging Evans's exclusion of Black neighborhoods from the area in which it would offer mortgages, as well as other racially discriminatory marketing practices.[4]

19.     Black Buffalo residents face many barriers to accessing safe, affordable housing, including substandard rental housing, high rent costs relative to neighborhood income, a disproportionate number of unkept and vacant lots, and a lack of green space and sidewalk infrastructure.[5]

20.     In addition to this residential segregation, Black Buffalo residents face ongoing disparities as compared to white Buffalo residents across a number of indicators. For example, the white homeownership rate is 73.4% while the Black homeownership rate is 28.9%.[6] Unemployment rates and average household incomes for Black residents have not improved since 1990.[7] Nearly half of the city's public schools are over 90% students of color[8] and over 70% of the schools are defined as "segregated."[9]

---

[4] Compl., ¶¶ 6-7, *Schneiderman v. Evans Bancorp, Inc.*, No. 1:14-cv-00726 (W.D.N.Y. 2014); Jessica Silver-Greenberg, *New York Accuses Evans Bank of Redlining*, N.Y. Times (Sept. 2, 2014), https://archive.nytimes.com/dealbook.nytimes.com/2014/09/02/new-york-set-to-accuse-evans-bank-of-redlining/.

[5] Henry-Louis Taylor, Jr., Jin-Kyu Jung & Evan Dash, *The Harder We Run: The State of Black Buffalo in 1990 and the Present*, U.B. Ctr. for Urb. Stud. 7 (Sept. 2021) https://www.investigativepost.org/wp-content/uploads/2021/10/TaylorHL-The-Harder-We-Run.pdf.

[6] Blatto, *supra* note 3, at 17.

[7] Taylor, *supra* note 5, at 7.

[8] Jim Heaney, *Buffalo is Segregation City*, InvestigativePost (May 17, 2022), https://www.investigativepost.org/2022/05/17/buffalo-is-segregation-city/.

[9] Mark Byrnes, *Buffalo Was Once a Model for Integration. Now the Vast Majority of its Public Schools Are Segregated*, Bloomberg (Apr. 11, 2014, 9:46 AM CDT) https://www.bloomberg.com/news/articles/2014-04-11/buffalo-was-once-a-model-for-integration-now-the-vast-majority-of-its-public-schools-are-segregated.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

21.     These racial disparities were laid bare in May 2022, when a white supremacist killed 10 Black people at Tops supermarket on the East Side of Buffalo. The shooter identified his target by selecting a zip code with the highest Black population.[10]

**B. HOME's Investigation.**

22.     As part of HOME's enforcement of anti-discrimination laws, including the FHA, it investigates incidents of discrimination, engages in litigation, and provides support for victims of housing discrimination and their families. HOME also regularly conducts testing to ensure that real estate professionals are not violating anti-discrimination laws.

23.     When conducting investigations, HOME employs individuals as "testers"—trained individuals who pose as bona fide home seekers for the purpose of observing and documenting the conduct of real estate professionals.

24.     HOME performs paired tests depending on the protected characteristics for which it is testing. For example, when investigating whether a real estate professional may be discriminating based on race, HOME pairs a white tester with a tester of another race.

25.     HOME instructs its testers on what to say when interacting with real estate professionals. Thus, testers provide the real estate professionals under investigation with the same specifications for their home search, including their budget, the loan amount for which they had been preapproved, and their preferred home amenities. Ensuring that testers provide the same, or comparable, information during paired tests allows HOME to more accurately assess whether the

---

[10] Shimon Prokupecz, Christina Maxouris, Dakin Andone, Samantha Beech & Amir Vera, *What we know about Buffalo supermarket shooting suspect Payton Gendron*, CNN (June 2, 2022), https://www.cnn.com/2022/05/15/us/payton-gendron-buffalo-shooting-suspect-what-we-know/index.html.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

real estate professionals under investigation provide the same information, service, treatment, and access to available listings to testers.

26.　　The Buffalo-Niagara Association of Realtors ("BNAR") is a membership organization comprised of realtors and realtor-associates, including brokers, salespeople, property managers, appraisers, bankers, attorneys and others, for the common purpose of "having a strong collective voice in decisions affecting the real estate profession."

27.　　In 2022, BNAR contracted with HOME to engage in testing of its members to assess their compliance with anti-discrimination laws.

28.　　In 2022, Defendant Glander, a realtor-member of BNAR, was listed by BNAR as one of Buffalo's top 30 Buyers' Agents. HOME chose to test Glander based on his position as a prominent buyers' agent in the region.

29.　　Between August 2022 and November 2023, HOME employed six testers, paired in sets of two, to test Defendants. HOME paired each white tester with a tester of another race. HOME followed its standard procedures when testing Defendants, and each pair of testers gave Defendants the same specifications for their home search, as described below.

**C. Test #1: August 3-17, 2022**

30.　　HOME's first test of Defendants' real estate practices included two testers. One tester is white, and one is of Middle Eastern descent. Both testers represented to Glander that they were married males but that their spouses were unavailable to meet on the day of the site visit. Both testers met with Glander alone. They each explained that they sought to purchase a new home and that they were looking to purchase a home in Buffalo for a more affordable place to live than New York City. The white tester represented he had a preapproval amount of $260,000 but a maximum desired budget of $230,000. The Middle Eastern tester represented he had a preapproval

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

amount of $280,000 but a maximum desired budget of $250,000. On August 3, 2022, Glander and the white tester spoke via phone and scheduled the first in-person meeting for two days later. Glander did not ask the white tester about whether he was preapproved to purchase a home.

31.     On August 5, 2022, Glander and the white tester, at the tester's request, discussed at length the homebuying process, how to make a competitive offer on a home, and the timeline for home ownership. After the white tester indicated that he did not have a preference for neighborhoods, Glander listed neighborhoods by zip code to the tester, describing them as nice homes within the tester's home budget. Glander described the Black Rock and West Side neighborhoods as really nice areas. Furthermore, he told the tester about the North Buffalo area, describing it as prestigious, and said these neighborhoods should be prioritized in the tester's home search.

32.     Additionally, Glander informed the tester about the first-time home buyer's grants that could be available for certain Buffalo neighborhoods.

33.     Glander then paused the discussion to state that he did not intend to steer or dissuade the white tester, as he knew it was against the law to do so, and that he would be happy to show the tester any home found in different zip codes. Nevertheless, Glander proceeded to list zip codes to the white testers that were in neighborhoods on the East Side of Buffalo and stated that they were not the best for safety. In reference to homes in the zip code 14211, which includes the neighborhoods of Martin Luther King Park and Schiller Park, Glander described the East Side as a place where you'd have gunshots, and recommended that the white tester go to a particular zip code for himself to see if a house looked like a crack house before deciding whether to make an offer.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

34.    On August 17, 2022, Glander and the Middle Eastern tester met in person after the tester left him a voicemail and exchanged text messages with him between August 10 and August 13. Glander and the Middle Eastern tester met at a coffee shop to discuss purchasing a home. Glander and the Middle Eastern tester discussed homes in the Buffalo area. Glander asked the Middle Eastern tester if he had been preapproved during their meeting and further inquired about how he could assist the tester.

35.    Glander and the Middle Eastern Tester discussed the tester's desired home requirements, and Glander sent this tester 180 homes listed, in comparison to the 52 he sent the white tester. Glander failed to provide the Middle Eastern tester with detailed analysis about housing opportunities or neighborhoods in the Buffalo Area. Whereas Glander discussed and described specific neighborhoods like Black Rock and Hamlin Park and offered in-depth advice about how to make a competitive offer by making a larger down payment with the white tester, he did not provide this information to the Middle Eastern tester, thereby limiting the opportunities available to this tester. Additionally, Glander did not make dissuading remarks to this tester about homes in predominately Black neighborhoods.

36.    In summary, Glander showed the white tester 52 listings; offered specialized advice and detailed commentary about Buffalo neighborhoods to the white tester, whose budget and preapproval was less than the Middle Eastern tester's; and discouraged the white tester from looking into predominantly Black neighborhoods on the East Side of Buffalo by making racially charged and derogatory remarks about those neighborhoods. By contrast, he provided a broader and more generalized listing result search to the Middle Eastern tester, without making any specific recommendations about neighborhoods or dissuading the tester from predominately Black neighborhoods on the East Side of Buffalo.

**D. Test #2: February 1-9, 2023**

37.     HOME's second test of Defendants' real estate practices included two testers. Both testers represented that they were married females, seeking to purchase a new home. Both testers explained to Glander that their spouses were unavailable to meet on the day of the site visit, and that they were looking to purchase a home in Buffalo. One tester is white, and one is Black. The white female tester represented a preapproval amount of $275,000 but had a maximum desired budget of $250,000 and the Black female tester represented she had preapproval amount for $305,000 and a maximum desired budget of $280,000.

38.     During a phone call on February 1, 2023, the white tester offered Glander information about her preapproval status. Glander did not require her to bring her letter of preapproval to their appointment the next day.

39.     On February 2, 2023, Glander and the white tester met in person for approximately forty minutes. Glander asked the white tester about housing and neighborhood preferences, noting that he had to be conscious about what he referred to as redlining in Buffalo. Glander offered the white tester contact information for a loan officer and home inspectors, and  mentioned that there is a grant available for prospective home buyers in certain Buffalo neighborhoods. Glander informed the white tester about housing opportunities in Kaisertown, Black Rock, South Buffalo, and North Buffalo. Glander did not recommend any homes in neighborhoods on the East Side of Buffalo, where the city's majority-Black neighborhoods are.

40.     On February 8, 2023, the Black tester left a voicemail at Avant, and Glander returned the call the same day. Glander asked about preapproval and requested that the tester bring the preapproval letter to the meeting, which was scheduled for the next day, February 9, 2023.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

41.    During the in-person meeting on February 9, 2023, Glander asked the Black tester if she was preapproved and, if so, through whom. During the meeting with the Black tester, Glander described Buffalo as a city made up of four quadrants. Glander described North Buffalo as expensive and South Buffalo as more affordable, with minimal but highly coveted inventory.

42.    Glander mentioned to the Black tester the history of redlining and that he understood the law required him to communicate carefully to homebuyers. Glander specifically defined redlining by stating that it happened when realtors would redline potential home seekers away from Black neighborhoods.

43.    Glander then proceeded to describe East Buffalo, where majority-Black neighborhoods are located, as the hood and a tough area. Glander explained that if someone were to send him a text asking if he should buy on the East side, and he responded, no way, that's the hood, he would get into a lot of trouble. The tester followed up: well, is it the hood? To which Glander responded: Oh yeah, for sure it is.

44.    Glander also added that Bengali families who moved into East Buffalo were gentrifying the community and upsetting other residents. Glander closed the conversation by stating that he has driven through East Buffalo and thought to himself, dang, you're not going to catch me living there.

45.    Glander next asked the Black tester if she enjoyed where she lived and if it was hood. Glander then explained that he was from Camden, New Jersey, and that neighborhoods there made East Buffalo look like a playground. Glander told the Black tester that he wanted to show her all neighborhoods and would not steer her away from any, but once he got a sense of what she liked, they could go from there. Glander asked the tester if she could fight or not, as it would determine where to search for houses.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

46.     Glander next described three neighborhoods to the Black tester—Elmwood Village, Black Rock, and East Side. He described Elmwood Village as an expensive and coveted area and Black Rock as blue collar and not having a lot of crime. He described the East Side as huge and the part where he told her not to go. He reiterated that he wanted to be careful about what he referred to as redlining but also wanted to tell people about bad neighborhoods. He described bad neighborhoods as those that he would see people on their front porches at noon on a weekday, rather than working.

47.     Despite Glander's numerous disparaging comments about the East Side, Glander still recommended the Black tester look for a home there, stating that the Black tester should keep her options open and look at all neighborhoods. While Glander did offer to leverage his previous experience in construction to the Black tester, he failed to offer information about first-time homebuyer grants or contacts for home inspectors or loan officers to the Black tester.

48.     In summary, Defendant Glander completely omitted any mention of East Side neighborhoods to the white tester, only describing neighborhoods in Kaisertown, Black Rock, South Buffalo, and North Buffalo. While meeting with the Black tester, Defendant Glander made negative comments to the Black tester about the East Buffalo area, calling it hood and encouraging her to evaluate neighborhoods based on whether she had the ability to fight. Nevertheless, Glander still encouraged the Black tester to consider the East Side neighborhoods, despite the Black tester's higher budget and preapproval amount than the white tester.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

**E. Test #3: October 2, 2023-November 22, 2023**[11]

49.    HOME's third test of Defendants' real estate practices included two testers. One tester is white, and one is Black. Both testers represented that they were married females, seeking to purchase a new home. Both testers explained to Glander that their spouses were unavailable to meet on the day of the site visit, and that they were looking to purchase a home in Buffalo for a more convenient location. The white female tester represented she had a preapproval amount of $315,000 but a maximum desired budget of $300,000, and the Black female tester had a $330,000 preapproval amount and a maximum budget of $330,000.

50.    On October 2, 2023, Glander had a phone call with the white tester and set a meeting for the following day, October 3, 2023. During the in-person meeting, the tester informed Glander that she had already obtained preapproval. As with the white tester from Test #2, Glander mentioned a $30,000 first-time homebuyer grant available to the white tester for homes in certain zip codes. He affirmed that he could find a home for the tester in her $300,000 budget and asked what her goals and non-negotiables were for the home.

51.    Glander described the East Buffalo area, where the majority-Black neighborhoods are, as "pretty rough" and discouraged the white tester from seeking homes in neighborhoods there, saying "I don't know if that's an area you want to look in." He mentioned the Black Rock, Riverside, and South Buffalo neighborhoods because of their proximity to the tester's job.

52.    Glander then began to explain how he needed to be careful to avoid "racial steering," but maintained his desire to effectively discourage the white tester from considering certain neighborhoods, explaining:

---

[11] This test was conducted outside of the scope of the BNAR/HOME contract. After completion of the first and second tests, HOME used additional resources to conduct a third test of Glander and Avant.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

53.    "I got to be pretty vague when it comes to directing you towards certain areas, it's something that's called steering. It's a real estate practice people used to use back in the day, it was more racial they would steer Black families away from white neighborhoods and white families away from Black neighborhoods. So, I got to be careful about what I say, but generally speaking, we can look at a few houses and my idea of a bad neighborhood and your idea of a bad neighborhood are completely different so we would have to go look and see if you're comfortable with it. I always tell people to drive by at night – go by at 8 o'clock and if you feel safe, you feel like you can get out of your car and walk to the corner store, great, let's put in an offer."

54.    Glander next made additional suggestions to the white tester in the South Buffalo neighborhood, Kaisertown, First Ward, West side, Fruit Belt, and more. In describing these neighborhoods, Glander described them as "yuppie," the type of place where "you see people walking their dog," and having a "real suburban feel."

55.    On November 8, 2023, the Black tester called and scheduled a meeting with Glander for two days later, on November 10, 2023. Glander and the tester spoke about the tester's desired home and price range.

56.    Glander generated 18 matches for the Black tester in the North and South Buffalo neighborhoods, in comparison to 66 matches he sent the white tester. Additionally, Glander told the Black tester it was important to get a feel of the neighborhood to make sure she was comfortable before selecting a home.

57.    Glander suggested that the Black tester visit neighborhoods at night, because that's when "nothing good happens," stating that he grew up "in the hood" and that the tester could use her own perspective to make a determination about the neighborhood. Glander gave the Black tester this advice generally, not in reference to a specific neighborhood or area of Buffalo.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

58.     In summary, Glander made several disparaging and discouraging comments about neighborhoods on the East Side of Buffalo to the white tester, calling them "pretty rough" and describing that they might be in "an area you do not want to look in." Glander did not discourage the Black tester from seeking housing on the East Side of Buffalo, as he had done with the white tester. Furthermore, he did not make the Black tester aware of grant opportunities that he informed the white tester about. Finally, Glander identified 48 fewer listings for the Black tester, even though the Black tester had a higher preapproval and maximum budget than the white tester.

59.     Taken together, HOME's testing reveals that Glander offered different recommendations about the scope, character and availability of housing opportunities to different testers based on race. White testers, on average, received more detailed advice about which neighborhoods and housing accommodations to choose, were given more affirmative suggestions about other assistance such as first-time home buyer grants, and were uniformly discouraged from seeking housing in the majority-Black neighborhoods on the East Side of Buffalo. By comparison, the two Black testers and one Middle Eastern tester, who had larger preapproval amounts and budgets for homes, were not uniformly discouraged from seeking housing on the East Side and, on average, received information about fewer housing opportunities.

60.     HOME's testing also reveals that Glander acknowledged multiple times that he was not allowed to discourage white testers from exploring certain neighborhoods – but did so anyway. Glander told testers that he could get in trouble for telling testers the East Side is an undesirable place to live. He specifically acknowledged that due to racial "steering" (which he explained as when realtors would steer Black home seekers away from white neighborhoods, and steer white home seekers away from Black neighborhoods"), he "could get into a lot of trouble saying what he did." Notwithstanding this recognition of rules prohibiting such racial steering, Glander

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

repeatedly continued to discourage white testers from seeking homes in these neighborhoods, while not similarly discouraging Black testers from seeking homes in those neighborhoods.

**F.   Harm to HOME**

61.     HOME has been directly and substantially harmed by Defendants' racial steering practices described herein. Defendants' conduct has diminished HOME's ability to perform its core activities; frustrated its mission of ensuring that all people have an equal opportunity to find housing, regardless of race, in Western New York; and forced it to divert its scarce resources from its other activities to identify and counteract Defendants' unlawful conduct, policies, and practices.

62.     Defendants' discriminatory conduct has directly interfered with HOME's core business activities, including HOME's ability to operate its Making Moves Program ("MMP"). MMP is a comprehensive housing mobility program designed to connect families with stable housing in low-poverty, well-resourced neighborhoods in Western New York. Through MMP, HOME provides comprehensive case management services to support home seekers find suitable housing, including individual counseling and support throughout the housing search process and assistance completing lease applications and other required paperwork. Additionally, HOME supports MMP participants who are interested in purchasing a home.

63.     Defendants' discriminatory conduct has impeded HOME's ability to operate the MMP. By not offering, encouraging, or discussing the true availability of housing opportunities to Black home seekers in the same manner as white home seekers because of their race, Defendants' conduct makes it more difficult for HOME to assist its clients with securing access to the true range of available housing in this region, which has a finite stock of available housing options. This is particularly so because Glander is one of the top 30 buyers' agents in Buffalo and, as described above, Defendants' practices result in Black home seekers learning of more housing

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

opportunities in lower-resourced neighborhoods, and fewer housing opportunities in well-resourced neighborhoods, as compared to white home seekers.

64.     Moreover, HOME has been compelled to engage in counteraction activities to address Defendants' discriminatory activity. HOME has committed, is committing, and will continue to commit scarce resources to identify and counsel potential home seekers impacted by Defendants' unlawful discriminatory policies or practices, investigate complaints, engage in education and outreach to potential victims of discrimination and real estate professionals, and develop and disseminate education materials to ameliorate the effects of Defendants' discriminatory actions. For example, HOME has provided training about racial steering to home seekers participating in its program designed to connect families to housing in well-resourced neighborhoods. HOME has also conducted outreach and community events in Western New York, including at schools and parks, to distribute information about housing discrimination, including racial steering, and to identify HOME as a resource for reporting housing discrimination.

65.     For these public outreach and community events, HOME staff members created and designed public education materials about housing discrimination to counteract the effects of Defendants' discriminatory conduct. To further educate potential victims of discrimination and to counteract racial steering, HOME has created and posted a series of public service announcements across multiple social media platforms. Additionally, after learning about Defendants' racial steering practices, HOME used the time of two staff members to design and lead three seminars for real estate professionals in the Buffalo-Niagara Falls metropolitan area to educate them on racial steering and its illegality. To further counteract Defendants' conduct, HOME used another staff member's time to create and distribute a new brochure specifically about racial steering in the home buying process after learning about Defendants' unlawful conduct. HOME distributed

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

this brochure to real estate professionals in an effort to counteract Defendants' conduct and educate real estate professionals about their obligations under the FHA and New York States Human Rights Law ("NYSHRL").

66.     Engaging in these counteraction activities has impeded HOME's ability to provide its other pre-existing core services, including counseling, referral services, education, investigation of complaints of discrimination, and the promotion of equal access to housing in Western New York. For example, as a result of the time HOME staff had to spend educating real estate professionals about racial steering and creating the resources necessary for this education and outreach, HOME staff had less time to apply for grants that would have allowed HOME to expand its education and outreach capacity. These counteraction activities differ and are in addition to HOME's regular, day-to-day activities.

67.     Moreover, as a direct result of Defendants' discriminatory conduct, HOME has had to divert resources to engage in advocacy, community education, and outreach about racial steering, as described above. HOME, which has fewer than 20 full-time staff members, has been forced to allocate limited staff time and resources to both investigate and counteract Defendants' discriminatory conduct. As a result, HOME has had to forego other core programmatic activities it would have engaged in, such as public education, counseling, and referral services.

68.     HOME began its investigation of Defendants in 2022. After an initial test of Defendants revealed racially disparate treatment of prospective homebuyers, HOME continued its investigation, performing two additional tests of Defendants. To perform these additional tests, HOME's employee who oversees testing had to design two additional tests, train the testers on the parameters of the tests, and document and analyze the results of the tests. The two additional tests also required that four staff members who serve as part-time testers receive instruction on the

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

parameters of the new tests, conduct the tests, and document what happened during the tests. If HOME had not found evidence that Defendants were engaging in racially disparate treatment of prospective homebuyers, it would have used its staff time to investigate other real estate professionals, including in response to complaints from victims of housing discrimination. Additionally, HOME could have used the funding it received from BNAR to investigate additional BNAR members, rather than concentrate resources on investigating Defendants.

69.     Unless enjoined, Defendants will continue to engage in the unlawful practices described herein, and the extent of HOME's injuries will increase. HOME's counteraction of Defendants' conduct, its diversion of resources away from its pre-existing, core activities, and the frustration of its mission continues and will continue until Defendants' discriminatory conduct ceases and the harms caused by Defendants' actions are remedied.

## CLAIMS FOR RELIEF

## COUNT I

## (VIOLATION OF FAIR HOUSING ACT)

70.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 69 as though fully set forth herein.

71.     Defendants offered different recommendations about the scope, character, and availability of housing opportunities to different testers based on race, as revealed by Plaintiff's testing. Defendants gave white testers, on average, more detailed advice about which neighborhoods and housing accommodations to choose, offered more suggestions about other assistance such as financing options, and uniformly discouraged the white testers from seeking housing in the majority-Black neighborhoods on the East Side of Buffalo. By contrast, Defendants did not uniformly discourage the two Black testers and one Middle Eastern tester from seeking

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

housing on the East Side and, on average, gave these testers information about fewer housing opportunities. This conduct, as described above, constitutes discrimination by failing to "negotiate for the sale or rental of, or otherwise mak[ing] unavailable or deny[ing]" a housing accommodation on the basis of race in violation of the FHA, 42 U.S.C. § 3604(a).

72.     Defendants' conduct, as described above, constitutes discrimination "in the terms, conditions, or privileges of sale" of a housing accommodation, "or in the provision of services or facilities in connection therewith," because of race or color, in violation of the FHA, 42 U.S.C. § 3604(b). *See Cabrera v. Jakabovitz*, 24 F.3d 372, 390 (2d Cir. 1994) (recognizing that racial steering violates the FHA).

73.     Defendants' conduct, as described above, afforded fewer opportunities to prospective Black and Middle Eastern homebuyers as compared to white prospective homebuyers in violation of the FHA.

74.     Plaintiff is an aggrieved entity as defined in 42 U.S.C. § 3602(i), because it has been injured by Defendants' discriminatory conduct, and has suffered damages as a result.

75.     Defendants' conduct was intentional, willful, and made in disregard of the rights of others.

76.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT II

## (VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW)

77.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as though fully set forth herein.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

78.    Defendants' conduct as described above constitutes discrimination by refusing to sell or otherwise denying or withholding a housing accommodation or by representing that a housing accommodation is not available for inspection or sale when, in fact, it is so available because of race or color, in violation of Article 15 of the New York Executive Law § 296(5)(a)(1) and 296(5)(c)(1). *See* Decision & Order Granting in Part & Denying in Part Def. Pranvera Celaj's Mot. for Summ. J*., Fair Hous. Just. Ctr., Inc. v. Broadway Crescent Realty, Inc.*, No. 10 Civ. 34(CM), 2011 WL 856095, at *9 (S.D.N.Y. Mar. 9, 2011) (recognizing that racial steering was cognizable claim under Section 296(5) and 296(6) of the New York State Human Rights Law); *see also Jackson v. Tryon Park Apartments, Inc.*, 6:18-cv-06238 EAW, 2019 WL 331635, at *5 (W.D.N.Y. Jan. 25, 2019) (recognizing that "[c]laims of discrimination under New York Executive Law § 296(5) . . . are analyzed under the same framework as is used for the FHA")(cleaned up).

79.    Defendants' conduct as described above constitutes discrimination in the terms, conditions, or privileges of the sale of a housing accommodation because of race or color, in violation of Article 15 of the New York Executive Law, § 296(5)(a)(2) and 296(5)(c)(2).

80.    Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by New York Executive Law § 296(5), in violation of the New York Executive Law § 296(6).

81.    Plaintiff has been injured by the Defendants' discriminatory conduct and has suffered damages as a result.

82.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

83.    Accordingly, under Article 15 of the New York Executive Law § 297, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment against Defendants and award Plaintiff the following relief:

A.    Declaring that Defendants' discriminatory practices violate the FHA, as amended, 42 U.S.C. § 3601 *et seq.*, and NYSHRL, New York Executive Law § 290 *et seq.*;

B.    Enjoining Defendants to end all violations of the FHA and NYSHRL and enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation with Defendants from discriminating on the basis of race or color, including the following:

    i.    Refusing to sell, denying, withholding, or otherwise making housing unavailable on the basis of race or color;

    ii.    Representing to any person that a dwelling is not available for inspection or sale when such dwelling is in fact so available because of race or color;

    iii.    Discriminating in the terms, conditions, or privileges of selling housing on the basis of race or color;

    iv.    Making, printing, or publishing any statement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination on the basis of race or color;

    v.    Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of any right granted or protected by the FHA; and

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

      vi.  Aiding, abetting, inciting, compelling, or coercing the doing of any of the acts forbidden by the NYSHRL;

C.     Issuing a permanent injunction requiring Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

      i.  Make all necessary modifications to their policies, practices, and procedures to comply with the law;

      ii.  Train all management, agents, and employees on fair housing laws; and

      iii.  Allow monitoring of their real estate practice to ensure compliance with the FHA and NYSHRL.

D.     Retaining jurisdiction over Defendants until the Court is satisfied that the Defendants' unlawful practices, acts, and omissions no longer exist and will not reoccur;

E.     Awarding Plaintiff monetary damages for each and every violation of the law;

F.     Awarding Plaintiff punitive damages in order to punish and deter the Defendants for their violations of the FHA and NYSHRL;

G.     Finding that Plaintiff is a prevailing party in this litigation and award reasonable attorneys' fees, costs, and expenses pursuant to the FHA and NYSHRL; and

H.     Granting Plaintiff such other and further relief as may be just and proper.

Dated: January 13, 2025             Respectfully submitted,

                             */s/ Rachel Kleinman*

                             Rachel Kleinman
                             Bar No. RK2141
                             Morenike Fajana*
                             Elizabeth Caldwell*
                             Maydrian Strozier-Lowe*
                             NAACP LEGAL DEFENSE &

*ATTORNEY WORK PRODUCT*
*PRIVILEGED & CONFIDENTIAL*

EDUCATIONAL FUND, INC.
40 Rector St., FL 5,
New York, NY 10006
(212) 965-2259
rkleinman@naacpldf.org
mfajana@naacpldf.org
bcaldwell@naacpldf.org

*pro hac vice* forthcoming

*Counsel for Plaintiff*